IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | |
|---|---|
| William M. Craig, III; Tina Craig, | Case No. 7:22-cv-01164-JDA |
| Plaintiffs, | |
| v. | **OPINION AND ORDER** |
| Sauer Brands, Inc., | |
| Defendant. | |
| Sauer Brands, Inc., | |
| Third Party Plaintiff, | |
| v. | |
| EcoLab, Inc., | |
| Third Party Defendant. | |

This matter is before the Court on a motion to dismiss or, in the alternative, for summary judgment filed by Defendant Sauer Brands, Inc. ("Sauer Brands"). [Doc. 66.] The motion has been fully briefed [Docs. 73; 78] and is ripe for consideration. For the reasons discussed, Sauer Brands' motion is denied.

**BACKGROUND**

In ruling on a motion for summary judgment, this Court reviews the facts and reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *see also Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426,

433 (4th Cir. 2013). Viewed in the light most favorable to Plaintiffs, the summary judgment record reveals the following facts.[1]

**Sauer Brands and EcoLab**

Sauer Brands manufactures condiments and sauces for retail and food service customers. [Doc. 73-5 at 76 (75:10–16).] In compliance with regulations from the U.S. Food and Drug Administration (the "FDA"), Sauer Brands cleans its production lines daily to prevent cross contamination and promote safe food. [*Id.* at 77 (76:2–13); Doc. 73-6 at 29 (29:17-23).] To accomplish this task, Sauer Brands has clean-in-place ("CIP") systems, which are automatic cleaning systems that clean inside pipes. [Docs. 73-5 at 76–77 (75:17–76:1); 73-6 at 26 (26:18–24); *see also* 73-7.]

The food and beverage division of Third Party Defendant EcoLab, Inc. ("EcoLab") sells cleaning chemicals to food manufacturers. [Doc. 73-6 at 24–25 (24:20–25:10).] Sauer Brands entered into an agreement (the "Contract") with EcoLab in August 2018 that required Sauer Brands to purchase its chemical cleaning and sanitizing products exclusively from EcoLab. [Doc. 73-2.] The Contract also provided that EcoLab would loan certain equipment to Sauer Brands. [*Id.* at 1–2, 7.] Additionally, when EcoLab sells

---

[1] As will be explained, Sauer Brands' motion is limited to the issue of whether Plaintiff William M. Craig, III, was Sauer Brands' statutory employee and, therefore, the exclusivity provision of the South Carolina Workers' Compensation Law bars Plaintiffs from bringing tort claims against Sauer Brands. [Doc. 66.] The Court limits its discussion of the facts of the case to those necessary to give a general background and to resolve Sauer Brands' motion. Additionally, although Sauer Brands filed its motion as one seeking dismissal under Rule 12(b)(1) for lack of jurisdiction or, in the alternative, seeking summary judgment, the Fourth Circuit Court of Appeals has clarified that the South Carolina Workers' Compensation Law cannot strip a federal court of subject matter jurisdiction. *Wideman v. Innovative Fibers LLC*, 100 F.4th 490, 494–98 (4th Cir. 2024). Accordingly, the Court analyzes the motion as one for summary judgment.

chemicals to customers, it provides services to them as well to ensure that their manufacturing and cleaning comply with FDA standards. [Doc. 67-2 at 10–11 (10:19–11:14).]

**Mr. Craig's Employment with EcoLab**

Plaintiff William M. Craig, III ("Mr. Craig") started working for EcoLab in 2016 as an account manager in the food and beverage division. [Doc. 73-6 at 24 (24:7–17).] As an account manager, he sold cleaning chemicals and provided services to his customers. [*Id.* at 24 (24:15–19); Doc. 73-4 at 98–99 (97:17–98:18.] Sauer Brands was one of Mr. Craig's customers, and he visited its facility at least twice per month. [Doc. 73-6 at 25 (25:6–12), 30 (30:4–10).] During these visits, he kept up with Sauer Brands' product inventories, observed and checked cleaning systems, made sure pumps were operating properly, assessed safety risks, and provided training. [*Id.* at 25 (25:13–21), 30 (30:17–22), 45–47 (45:2–47:6).] When he finished a visit, Mr. Craig completed a service report documenting what he did during the visit, and the report was sent to his contact at Sauer Brands and sometimes to management. [*Id.* at 31–32 (31:21–32:6); *see* Doc. 73-3.]

**The November 25, 2019, Incident**

On November 25, 2019, Mr. Craig arrived at the Sauer Brands facility and set out to check on the CIP systems. [Doc. 73-6 at 48 (48:5–12), 50 (50:1–19).] He went into the CIP 4 room, where a Sauer Brands' CIP operator informed Mr. Craig about a problem with the sanitizer pump. [*Id.* at 50 (50:18–22).] Mr. Craig offered to look at the pump, and in doing so identified a crack in the pump and determined that the pump needed to be replaced. [*Id.* at 50 (50:22–51:2).] Mr. Craig offered to fix the pump because the CIP

operator was waiting to run a CIP.  [*Id.* at 51 (51:2–5).]  Mr. Craig got his tools and replaced the pump.  [*Id.* at 51 (51:5–14).]

After he replaced the pump, Mr. Craig washed the area where the chemicals had leaked with a hose that was in the CIP 4 room and let the CIP operator know he could start up the CIP.  [*Id.* at 51 (51:14–24).]  When the CIP operator started the system, it began overflowing.  [*Id.* at 51 (51:25–52:1).]  Mr. Craig and the CIP operator both thought the high-level sensor might have caused the overflowing, so the CIP operator "took the probe out of the top of the tank and blew it off, reattached it, put it back in and started [it] up again."  [*Id.* at 52 (52:2–6).]  After the CIP system started back up, Mr. Craig observed that "it was running fine."  [*Id.* at 52 (52:6–7).]

Mr. Craig left the CIP 4 room, informed another Sauer Brands employee about fixing the pump and the other tasks Mr. Craig planned to do during his visit, and then he went back into the CIP 4 room to get his tools.  [*Id.* at 52 (52:7–21).]  When he walked back into the CIP 4 room, he saw that the CIP system was overflowing again.  [*Id.* at 52 (52:21–22).]  As he was walking toward the CIP tank, Mr. Craig's glasses fogged up.  [*Id.* at 58 (58:1–6).]  He wiped off his glasses and continued toward the tank.  [*Id.* at 58 (58:6–18).]  At that point, Mr. Craig tripped over the hose he had previously used to wash away the leaked chemicals.  [*Id.* at 52–53 (52:22–53:9).]  Mr. Craig fell face first into a push-up position on the ground and into a puddle of chemicals that had overflown from the CIP system.  [*Id.* at 59 (59:5–17).]

Mr. Craig was concerned about getting the chemicals in his eyes, so he closed them as he fell and then kept them closed, stood up, and yelled for help.  [*Id.* at 59–60 (59:12–60:3).]  Sauer Brands employees responded to Mr. Craig's screams, but they did

4

not know the location of the nearest operating eyewash station and had to find a supervisor. [*Id.* at 60 (60:3–22).] The supervisor took Mr. Craig to an eyewash station but after two or three minutes, the eyewash station lost water pressure. [*Id.* at 60–61 (60:22–61:14).] Mr. Craig asked one of the Sauer Brand employees to have the CIP system turned off because he knew that would bring the water pressure back up. [*Id.* at 61 (61:18–22).] However, the employee never returned, and a Sauer Brands sanitation leader then took Mr. Craig to a men's room and hosed him down for 20 to 25 minutes with a high-pressure hose that was not tied into the plant's water pressure. [*Id.* at 61–63 (61:23–63:5).] Mr. Craig then drove himself to the emergency room. [*Id.* at 63 (63:6–11).]

After arriving at the emergency room, the staff took Mr. Craig to a decontamination chamber and flushed him for 30 minutes with cool water. [*Id.* at 78 (78:10–15).] Next, they attached probes to his eyes and started a saline solution. [*Id.* at 78 (78:18–22).] The doctor took a picture of Mr. Craig's wounds and sent them to staff at the Augusta Burn Center, who indicated that Mr. Craig would likely need skin grafts and asked Mr. Craig to report to the Augusta Burn Center at 8:00 the following morning. [*Id.* at 78–79 (78:22–79:7).] Mr. Craig had third-degree burns over 14.5 percent of his body and second-degree burns over other parts of his body, and the Augusta Burn Center performed grafting on the third-degree burns using cadaver and pig skins. [*Id.* at 80:9–15).] Later, Mr. Craig started developing pain in his shoulder, elbow, and arm, and ultimately had surgery on his left shoulder, left elbow, and left wrist. [*Id.* at 81–82 (81:18–82:13).]

**This Action**

Plaintiffs filed this action in the Spartanburg County Court of Common Pleas on March 4, 2022, and Sauer Brands removed it to this Court on April 8, 2022. [Docs. 1; 1-1.] Plaintiffs filed an Amended Complaint on January 25, 2023, asserting claims against Sauer Brands for negligence/gross negligence based on its failure to maintain a safe working environment and failure to provide an adequate emergency response system, for strict liability based on its failure to properly handle and store dangerous chemicals, for vicarious liability, and for loss of consortium. [Doc. 38 ¶¶ 29–50.] They seek actual and punitive damages and costs. [*Id.* at 7.]

## APPLICABLE LAW

Rule 56 of the Federal Rules of Civil Procedure states, as to a party who has moved for summary judgment:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477

U.S. 317, 323 (1986).  Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings.  *Id.* at 324.  To refute such a showing, the non-moving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material factual dispute.  *Id*. at 322.  Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion.  *Anderson*, 477 U.S. at 252.  Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion.  *Id.* at 248.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*  Further, Rule 56 provides in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  Accordingly, when Rule 56(c) has shifted the burden of proof to the non-movant, he must produce existence of a factual dispute on every element essential to his action that he bears the burden of adducing at a trial on the merits.  Merely

7

alleging that a factual dispute exists cannot defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 256.

## DISCUSSION

In its motion for summary judgment, Sauer Brands argues that Mr. Craig was Sauer Brands' statutory employee and, therefore, the exclusivity provision of the South Carolina Workers' Compensation Law (the "Law") bars Plaintiffs from bringing tort claims against Sauer Brands. [Doc. 66.]

The exclusivity provision of the Law provides in relevant part that

> [t]he rights and remedies granted by this title to an employee when he and his employer have accepted the provisions of this title, respectively, to pay and accept compensation on account of personal injury or death by accident, shall exclude all other rights and remedies of such employee, his personal representative, parents, dependents or next of kin as against his employer, at common law or otherwise, on account of such injury, loss of service or death.

S.C. Code § 42-1-540. Based on this provision, South Carolina courts hold that the Law provides the exclusive remedy against an employer for an employee who sustains injuries arising out of his employment. *Sabb v. S.C. State Univ.*, 567 S.E.2d 231, 234 (S.C. 2002).

Coverage under the Law generally depends on the existence of an employer-employee relationship. *Posey v. Proper Mold & Eng'g, Inc.*, 661 S.E.2d 395, 399 (S.C. Ct. App. 2008). However, the Law provides an exception to this general rule for what are known as "statutory employees." *Id.* Specifically, the Law provides:

> When any person, in this section and Sections 42-1-420 and 42-1-430 referred to as "owner," undertakes to perform or execute any work which is a part of his trade, business or occupation and contracts with any other person (in this section and Sections 42-1-420 to 42-1-450 referred to as "subcontractor") for the execution or performance by or under such subcontractor of the whole or any part of the work

8

>  undertaken by such owner, the owner shall be liable to pay to any workman employed in the work any compensation under this title which he would have been liable to pay if the workman had been immediately employed by him.

S.C. Code Ann. § 42-1-400. "The rationale [for covering statutory employees] is to prevent owners and contractors from subcontracting out their work to avoid liability for injuries incurred in the course of employment." *Glass v. Dow Chem. Co.*, 482 S.E.2d 49, 50 n.1 (S.C. 1997). Although the statutory employee provision was designed to protect employees, the same standards apply whether raised as a sword to impose liability on an employer under the Law or as a shield to protect the employer from liability for a tort claim. *See Keene v. CNA Holdings, LLC*, 870 S.E.2d 156, 162 (S.C. 2021) (declining to adopt "a different standard of review for cases in which the [Law] is used as a shield to liability" (internal quotation marks omitted)).

"[W]hat constitutes part of an employer's trade, business or occupation is a question that has vexed South Carolina courts from the beginning." *Zeigler v. Eastman Chem. Co.*, 54 F.4th 187, 195 (4th Cir. 2022) (internal quotation marks omitted). In *Keene*, the Supreme Court of South Carolina "set out to synthesize and clarify this muddled doctrine." *Id.* There, the court indicated that the "tests" it had developed over time remain valid considerations when determining what is part of an owner's business[2] but "refocus[ed] on the key question posed by the statute," directing that courts should

---

[2] Those tests require the court to consider "whether (1) the activity of the subcontractor is an *important* part of the owner's trade or business; (2) the activity performed by the subcontractor is a *necessary, essential, and integral* part of the owner's business; or (3) the *identical activity* performed by the subcontractor has been performed by employees of the owner." *Collins v. Charlotte*, 772 S.E.2d 510, 514 (S.C. 2015) (internal quotation marks omitted). "If any of these tests is satisfied, the injured worker is considered the statutory employee of the owner." *Id.* (internal quotation marks omitted).

9

focus initially on what the owner decided is part of its business. *Keene*, 870 S.E.2d at 163. And what is part of that business "is a question of business judgment, not law." *Id.* Ultimately, the court held that when a company makes a "legitimate business decision" to outsource certain work, the contractors it hires to perform that work are not statutory employees for workers' compensation purposes. *Id.*

Sauer Brands contends that it did not completely outsource the service and maintenance of its CIP systems because its own employees run, maintain, and repair the CIP systems daily, as opposed to Mr. Craig's service checks that occurred only twice per month, and because Sauer Brands and EcoLab worked together as partners in the plant's activities. [Doc. 66 at 7–11.] Sauer Brands further argues that it can meet one, if not all, of the more traditional tests because maintenance of the CIP systems is an important part of Sauer Brands' business; is a necessary, essential, and integral part of Sauer Brands' business; and is an activity performed by Sauer Brands' employees. [*Id.* at 11–16.] However, Mr. Craig has explained that food "[s]anitation operations consist of two separate and distinct systems that work in tandem to effectuate the entire cleaning process that is performed by a CIP system." [Doc. 73-1 ¶ 11.]

One system "consists of chemical barrels, pumps and hoses that literally deliver the chemicals from the chemical storage barrels and into the [c]leaning [s]ystem" (the "Chemical Delivery System"). [*Id.* ¶ 11.a.; *see id.* at 23.] The second system is "operated in such a manner that when the[] cleaning cycle is started, it relays a message to the Ecolab Chemical Delivery System to provide the delivery of the Ecolab Chemicals necessary to complete that portion of the customer's cleaning cycle" (the "Cleaning System"). [*Id.* ¶ 11.b.; *see id.* at 25.] Although the Chemical Delivery System "works in

10

tandem" with the Cleaning System, "it is a separate and distinct system and [is] often separately located away from the" Cleaning System. [*Id.* ¶ 11.a.] Mr. Craig avers that he has "never operated the CIP at Sauer [Brands]," and he has "never seen or heard of a Sauer [Brands] employee performing maintenance on an Ecolab Chemical Delivery System." [*Id.* ¶ 14.] Indeed, Mr. Craig avers that Sauer Brands and its employees "did not have access to the Ecolab pumps and parts that are required for the distribution of Ecolab chemicals to the Sauer [Brands Cleaning System]." [*Id.*] Moreover, at times when the Chemical Delivery System was not properly delivering chemicals, Mr. Craig has "witnessed a Sauer [Brands] employee manually add the Ecolab cleaning chemicals using hand pumps until [Mr. Craig] was able to replace the Ecolab pump." [*Id.*] Mr. Craig further avers that on the date he was injured at Sauer Brands' facility, the sanitizer pump he replaced was part of the Ecolab Chemical Delivery System.[3] [*Id.* ¶ 15.]

---

[3] In its reply memorandum, Sauer Brands asks the Court to disregard and exclude Mr. Craig's affidavit under the sham affidavit doctrine because "it attempts to re-define the work he was performing at the time of the [i]ncident." [Doc. 78.] Sauer Brands contends that Mr. Craig fully and comprehensibly explained the activity he was performing at the time of the incident during his deposition and that his affidavit "attempts to create a new factual scenario of the incident in order to defeat Sauer Brands' dispositive motion." [*Id.* at 2–4.] The Fourth Circuit Court of Appeals has held,

> If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact. A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.

*Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984) (internal quotation marks and citation omitted). However, here, the Court concludes that there is no bona fide inconsistency between Mr. Craig's deposition testimony and his affidavit. *See Spriggs v.*

11

Based on the summary judgment record, the Court is unable to conclude that Mr. Craig was Sauer Brands' statutory employee because the record supports a finding that Sauer Brands made a legitimate business decision to outsource the services provided by EcoLab. *See Keene*, 870 S.E.2d at 163. Although Sauer Brands has asked the Court to exclude Mr. Craig's affidavit explaining that he performed maintenance only on the Chemical Delivery System and that EcoLab employees performed maintenance only on the Cleaning System, it has provided no evidence to suggest that Mr. Craig or anyone from EcoLab operated or performed maintenance on the same equipment that Sauer Brands' employees worked on, which may support a finding that Sauer Brands had not decided to outsource those services. Indeed, Sauer Brands produced no evidence opposing Mr. Craig's affidavit beyond the argument that it is a sham. *See Knibbs v. Momphard,* 30 F.4th 200, 213 (4th Cir. 2022) ("Summary judgment is only appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." (internal quotation marks omitted)).

---

*Diamond Auto Glass*, 242 F.3d 179, 185 n.7 (4th Cir. 2001) (explaining that for the sham affidavit doctrine to apply, "there must be a bona fide inconsistency," and ultimately considering the affidavit at issue because there was no inconsistency between the deposition testimony and affidavit at issue). At his deposition, Mr. Craig referred generally to the CIP system and to replacing a sanitizer pump [*see, e.g.*, Doc. 73-6 at 50–52 (50:18–52:23)], and in his affidavit, he clarifies that the overall CIP system involves two separate systems and delineates what part of the cleaning process each system controls and what his role was in servicing those systems [Doc. 73-1 ¶¶ 4, 11, 14–17]. But nothing in his affidavit *contradicts* his deposition testimony, and other record evidence supports the explanation in Mr. Craig's affidavit. [*See, e.g.*, Doc. 73-3 at 32 (service record completed by Mr. Craig, indicating that during a visit in 2016, he performed maintenance on the "dispensing equipment" by replacing the tubing on a sanitizer pump and then observed the CIP and informed a Sauer Brands' employee of any issued identified).] Accordingly, the Court declines to exclude Mr. Craig's affidavit.

12

Moreover, Mr. Craig's service reports support his assertion that he "conducted several consulting roles when visiting [his] customer's plants." [Doc. 73-1 ¶ 8; *see, e.g.*, 73-3 at 50–51 (noting that, in a 2017 visit to Sauer Brands, Mr. Craig met with plant management to discuss implementation of a monitoring system, performed inventory of EcoLab products, made plant safety recommendations regarding the functionality of eyewash stations, and performed titrations on chemical dispensers); *see also* Docs. 73-5 at 21 (20:2–6) (agreeing that EcoLab consulted with Sauer Brands on plant operations)]; *cf. Kalos v. Cedar Fair SW, Inc.*, No. 0:22-1114-MGL, 2024 WL 1258818, at *3 (D.S.C. Mar. 25, 2024) (concluding that a contractor was not a statutory employee of an amusement park where the park had made a legitimate decision to outsource the annual inspection of wire cables on a ride even though an amusement park employee conducted a daily inspection of the cables). Additionally, the record lacks any evidence that Sauer Brands decided to outsource these services to avoid the costs of workers' compensation insurance. *See Keene*, 870 S.E.2d at 163 ("If a business manager reasonably believes her workforce is not equipped to handle a certain job, or the financial or other business interests of her company are served by outsourcing the work, and if the decision to do so is not driven by a desire to avoid the cost of insuring workers, then the business manager has legitimately defined the scope of her company's business to not include that particular work."). Accordingly, applying *Keene*, the Court concludes that Sauer Brands has not established that Mr. Craig was its statutory employee.

## CONCLUSION

For these reasons, Sauer Brands' motion for summary judgment [Doc. 66] is DENIED.

13

IT IS SO ORDERED.

                                                            s/ Jacquelyn D. Austin
                                                            United States District Judge

August 5, 2025
Greenville, South Carolina